H. R. Switow and Florence K. Switow, husband and wife v. Commissioner. Sam J. Switow and Irma J. Switow, husband and wife v. Commissioner.
Switow v. Commissioner
Docket Nos. 42796, 42797.
United States Tax Court
T.C. Memo 1956-63; 1956 Tax Ct. Memo LEXIS 232; 15 T.C.M. (CCH) 291; T.C.M. (RIA) 56063; March 16, 1956
*232 Frank A. Garlove, Esq., 600 Marion E. Taylor Building, Louisville, Ky., and Irwin G. Waterman, Esq., for the petitioners. John L. Carey, Esq., and Gene W. Reardon, Esq., for the respondent. LEMIRE Memorandum Findings of Fact and Opinion These consolidated proceedings involve deficiencies in income tax for the year 1948 as follows: Docket No.
Deficiency
42796
$4,949.41
42797
7,738.70
The contested issue is whether the amount received by petitioners on the determination of their contractual arrangements with the Anderson Theatrical Enterprises is taxable as ordinary income or as capital gain. Findings of Fact The stipulated facts are found accordingly. H. R. Switow and Florence K. Switow are husband and wife. Sam J. Switow and Irma J. Switow are husband and wife. All reside in Louisville, Kentucky. Their respective joint returns for the period involved were filed with the collector of internal revenue for the district of Kentucky at Louisville, Kentucky. H. R. Switow and Sam J. Switow will be hereinafter referred to as the petitioners since their wives are involved solely because of the filing of a joint return. The petitioners are *233 brothers engaged in the operation of moving picture houses, and during the periods involved operated between 15 and 25 theatres. In 1927 the petitioners worked out an agreement for the purchase of property located in Anderson, Indiana, known as the Riviera Theatre, plus leases on two theatres known as the Starland and the Granada. These properties were owned by Niel McCullough and Fred Mustard and the M and M Realty Company, a corporation owned by them. The petitioners had been affiliated with Fred Levy and Lee Goldberg in other theatrical ventures and the latter were invited to join in the purchase. On March 19, 1927, petitioners, together with Levy and Goldberg, executed an agreement with M and M Realty Company to purchase the Riviera Theatre property and equipment for the stated consideration of $230,000. At the time of the execution of the agreement $30,000 was paid in cash, and notes signed by all four parties were delivered for the balance of the consideration. The notes were for equal amounts and matured over a period of ten years. Anderson Theatrical Enterprises, Incorporated, hereinafter referred to as Anderson, was immediately organized. The aforementioned contract *234 was assigned to Anderson in exchange for 3,000 shares of its common capital stock, and 1,500 of such shares were issued to petitioners. Shortly thereafter a disagreement arose between Levy, Goldberg and petitioners as to the installation of sound equipment. Thereupon petitioners sold their 1,500 shares of Anderson's stock to Principal Theatres Corporation Central. Since petitioners remained personally obligated on the notes for the balance of the purchase price of the Riviera Theatre property, Levy and Goldberg executed a written agreement to indemnify petitioners against loss upon such obligations. In the summer of 1932 petitioners were notified that there was default in payments due the M and M Company which was threatening to foreclose. Realizing that Levy and Goldberg were in financial difficulties and that a sale of the property would not yield sufficient funds to satisfy their outstanding obligations under the purchase agreement, petitioners entered into an oral arrangement with Levy and Goldberg under which petitioners were to operate the Riviera Theatre. Under the arrangement petitioners were to pay Anderson an amount sufficient to make the payments to M and M Realty Company. *235 Petitioners were to receive 25 per cent of any remaining balance and were to share any losses in the same proportion. It was also agreed that a further investment of $3,000 was to be made, of which amount petitioners contributed $750. In 1934 the operation of the Riviera Theatre did not realize sufficient earnings to satisfy the payments required under the original purchase agreement. On May 18, 1934, Levy, Goldberg, and petitioners received a written notice from the M and M Realty Company that it was exercising its option to declare the 1927 contract of purchase terminated and to repossess the property. On June 1, 1934, a new agreement was entered into by all the parties, modifying the terms of the payments to be made to the M and M Realty Company. Thereupon Levy and Goldberg executed a new agreement with petitioners under which the former covenanted to save petitioners harmless from any loss arising by virtue of their personal liability on the notes they had executed and delivered at the time of the original purchase of the Riviera Theatre property. Petitioners continued to operate the Riviera Theatre under the oral agreement of 1932 with Levy and Goldberg until December 1, 1939. *236 Anderson and petitioners entered into a written agreement under date of December 1, 1939. Because of the complicated relationship between the parties this agreement was intended to buttress the oral understanding without covering the entire relationship of the parties. The agreement reads as follows: "THIS AGREEMENT entered into this 1st day of December 1939, by and between ANDERSON THEATRICAL ENTERPRISES, an Indiana corporation, party of the first part, and SAM J. SWITOW and HARRY R. SWITOW of Louisville, Kentucky, parties of the second part, "WITNESSETH: "(a) That Anderson Theatrical Enterprises owns and operates the Riviera Theatre in Anderson, Indiana, such ownership being qualified by and subject to the terms and conditions of a certain agreement and amended agreement dated respectively March 19, 1927 and June 1st 1934, entered into between M. and M. Realty Company, Fred Levy, Lee Goldberg, Sam Switow and Harry Switow; "(b) That parties of the second part are now, and for a number of years have been actively engaged in managing said Riviera Theatre, and are also personally involved, as guarantors, in the agreements referred to in the preceding paragraph; "(c) That it *237 is the desire of all the parties hereto that parties of the second part shall continue to manage said theatre. "IN CONSIDERATION of the mutual covenants, agreements and undertakings herein contained, and for other good and valuable considerations, it is hereby understood and agreed between the parties hereto as follows: "FIRST: Party of the first part hereby employs and retains party of the second part for the period commencing with the date hereof and ending on the day of October 1952, or at such later date as the parties of the second part shall be released and discharged from all liability under the said agreement and amended agreement of March 19, 1927 and June 1934, respectively, or until the said agreement and amended agreement shall have been fully performed, subject to the provisions of Paragraph SIXTH hereof. "SECOND: Parties of the second part agree to manage and conduct the booking for said Riviera Theatre, and to devote to such work all the time, ability and experience reasonably necessary to the proper performance of their duties. Parties of the second part further agree that, during the term of this agreement, neither of them will engage in the moving picture business *238 in Anderson, Indiana, except as herein provided. "THIRD: Parties of the second part shall receive from Anderson Theatrical Enterprises for booking and management, a salary of Thirty-five Dollars ($35.00) per week, plus twenty-five per cent (25%) of the net profits resulting from the operation of said Riviera Theatre. The net profits shall be determined by deducting from the gross receipts the usual and necessary costs of operation, a proper reserve against actual or contingent liabilities, and all other expense, including but not limited to rent, taxes and insurance; rent shall be that amount which is paid to McCullough and Mustard, or which may hereafter be paid to their successors or assigns, yearly on principal and interest, which is now being paid at the rate of Ten Thousand Eight Hundred Dollars ($10,800.00) per year; and further, the item of rent shall be reduced and credited to the extent of any rentals received by parties of the first part from any tenants using the Riviera Building less the cost of operation, repairs and upkeep of that part of said building not used for theatre purposes. "FOURTH: Parties of the second part hereby agree to be charged with and to be liable *239 for twenty-five per cent (25%) of the cost of any theatre equipment which shall be purchased in the usual course of the operation of said theatre, and of any improvements which the parties, by agreement, shall consider reasonably necessary in and to the proper operation and maintenance of said theatre. In the event that any such equipment shall be purchased, or any such improvement undertaken, the twenty-five per cent (25%) interest therein of parties of the second part shall be set up on the books of Anderson Theatrical Enterprises and credited to the investment account of parties of the second part. It is expressly understood and agreed that parties of the second part shall not be charged with and shall not be liable for any part of the cost of equipment in or improvements to any part of the Riviera Building not used for theatre purposes. "FIFTH: Party of the first part agrees to employ a resident theatre manager at Anderson, Indiana; but, except for the services of said resident manager, no officer or stockholder of party of the first part shall receive any compensation for services rendered to or in connection with said Riviera Theatre, and no other person, firm or corporation *240 shall receive compensation for managerial or executive services performed for or in connection with said theatre, except that party of the first part shall have the right to pay compensation to one or more of its officers upon the condition that the compensation herein provided for parties of the second part shall be proportionately increased. "SIXTH: Party of the first part may terminate this agreement by giving to second parties written notice of such termination at any time prior to the expiration of the term hereof upon compliance by first party with all of the following conditions: "(a) Pay to the second parties the sum of Twelve Thousand Dollars ($12,000); "(b) Pay to second parties the amounts credited to the parties of the second part in the investment account described in Paragraph FOURTH of this agreement; and "(c) Pay and satisfy all obligations of the party of the first part of McCullough and Mustard and/or M. & M. Realty Company with respect to which in whole or in part parties of the second part are guarantors, or secure from the said McCullough and Mustard or the said M. & M. Realty Company or their successors or assigns with respect to said obligations, a release *241 of the parties of the second part with respect thereto. "Nothing herein contained shall be deemed to limit the first party's rights of termination, suspension and offset with respect to this agreement, or the terms, conditions or covenants thereof by reason of the happening of any contingency giving rise to such right, or for or because of the breach of this agreement or the breach of any term or condition thereof by the parties of the second part. "IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals the day and year first above written. "ANDERSON THEATRICAL ENTERPRISES, "By /s/ Fred Levy / Party of the First Part "/s/ Sam J. Switow / (Sam J. Switow) "/s/ Harry R. Switow / (Harry R. Switow) Parties of the Second Part." In 1941 petitioners were offered the opportunity of leasing the Starland Theatre in Anderson, Indiana, and the lease was acquired by Anderson. The Alliance Theatre Corporation, engaged in operating another theatre in Anderson, requested participation and the Times Theatre, Inc., was organized. Fifty per cent of the stock was held by Anderson and 50 per cent was held by Alliance. Petitioners thereafter received one-fourth of *242 Anderson's share of the profits from the operation of the Starland Theatre, although they performed no work other than putting the theatre in operating condition. In 1946 petitioners were offered the opportunity of leasing the Colonial Theatre in Anderson, Indiana. The lease was taken in the name of the Times Theatre, Inc. Petitioner also received one-eighth of the profits from the operation of the Colonial Theatre, although they performed no work in connection with its operation. Petitioners received audit reports prepared by the firm of Waldman and Levitan, certified public accountants, covering the operation of the Riviera Theatre for each of the years 1932 to 1947, inclusive. These reports reflected the earnings, expenses, distributions, and investment accounts of both Anderson and the petitioners. The insurance on the Riviera Theatre for all coverage, except on the property itself, was carried on the master policy of the Switow Theatrical Company, was billed to its account, and, in turn, was charged to the Riviera Theatre. The purchase of equipment, such as carpets, projectors, and supplies, and the buying and booking of film for the Riviera Theatre were all handled through *243 the Switow Theatrical Company. On October 21, 1948, Anderson and petitioners entered into a written agreement (Exhibit 8), incorporated herein by reference. After reciting that the parties had since 1932 entered into various oral and written agreements in connection with the operation of the Riviera Theatre, Times Theatre, and Colonial Theatre, and that the parties desired to terminate all contractual relationship, it was agreed that petitioners would release Anderson and would "bargain, sell, convey and assign" all their "right, title and interest" in such theatres. As consideration Anderson agreed to pay to the petitioners the sum of $25,000 in cash upon the execution of the agreement, and such further sum, if any, determined under a specified formula. The latter amount is not here involved. No partnership returns for the theatres heretofore mentioned were filed during the years 1927 to 1948, inclusive. On his joint return for the taxable year 1948 each petitioner reported one-half of the $25,000, or $12,500, as a long-term capital gain. In his deficiency notices the respondent treated the amount of $12,500 as ordinary income of each petitioner. During the period 1932 to *244 October 21, 1948, petitioners and Anderson were engaged in the operation of the various theatres in question as joint venturers. In the taxable year 1948 each petitioner realized a gain of $12,500 from the sale of a capital asset held for a period of more than six months. Opinion LEMIRE, Judge: The question for decision is the proper treatment for tax purposes of the sum of $25,000 received by petitioners in the taxable year 1948. The respondent contends that the payment was consideration received by petitioners for the cancellation of their employment agreement and is taxable as ordinary income. Petitioners contend that the payment was the gain realized from the sale of all their right, title, and interest in the partnership or joint venture with Anderson and should be given capital gains treatment. The answer to the question involves a determination of the relationship of petitioners to Anderson. This in turn requires us to ascertain the intent of the parties, which is to be gathered from their oral and written agreements and all the facts and circumstances bearing on their relationship. We have recognized that according to the prevailing law *245 a corporation has no implied power to become a partner with an individual. , citing 13 American Jurisprudence, section 823. The courts have sustained the validity of a joint enterprise between a corporation and an individual. ; ; . A joint venture may exist where the parties engage in a common enterprise for their mutual benefit without entering into a business as partners strictly. The respondent contends that the agreement of December 1, 1939, indicates that the parties intended an employment contract since it recites that Anderson "employs and retains" petitioners and provides that they shall receive a salary of $35 per week plus 25 per cent of the profits. If it were not for such provisions there would seem to be no room to argue that the relationship intended was one of employment. Mere terms used to designate the relationship are not conclusive. Moreover, the evidence shows that the agreement of *246 December 1, 1939, was not intended to cover the entire relationship of the parties. The testimony of petitioners and the written agreement of October 21, 1948, under which the payment in controversy arose, reveals the existence of additional oral agreements bearing on the relationship of the parties. The record establishes a number of features indicating the parties intended a joint venture rather than a mere employment. The salary expressed was rather nominal and was to cover out-of-pocket expenses which would be incurred in the management of the Riviera Theatre; petitioners were required to make a contribution and to share in the losses as well as the profits; the system of accounting and booking employed; and the recognition by Anderson of the right of petitioners to share in the profits resulting from the operation of other theatres in Anderson, Indiana, for which they performed no management services, all point to a joint undertaking rather than an employment agreement. After due consideration of the evidence revealed by the entire record we are of the opinion that the parties intended the relationship to be that of joint venturers. The payment in controversy was received *247 by the petitioners as consideration for the sale of their interest in such venture and is subject to capital gains treatment. As the capital asset was held for a period of more than six months the gain realized is taxable as a long-term capital gain. We hold that the respondent erred in taxing the gain as ordinary income of each petitioner. Decisions will be entered under Rule 50.